UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WARNER GOMEZ,
                      Plaintiff,

-v-

CITY OF NEW YORK, *et al.*,
                      Defendants.

15-CV-7524 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Warner Gomez is a police officer employed by the New York City Police Department ("NYPD"). In his First Amended Complaint ("the Complaint") (Dkt. No. 47 ("FAC")), Gomez alleges that he was assaulted by a fellow police officer while on duty and that various NYPD sergeants and police officers subsequently pressured him to refrain from reporting the incident. (*Id.* ¶ 1.) Gomez claims that the City of New York ("the City") and various individual defendants violated his rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution and engaged in unlawful discriminatory practices in violation of the New York City Human Rights Law ("NYCHRL"). (*Id.* ¶¶ 1–2.) Several of the defendants now move to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. (Dkt. No. 78.) For the reasons that follow, the motion is granted in part and denied in part.

**I.    Background**

      The following facts are taken from the Complaint and are presumed true for purposes of deciding the motion to dismiss under Rule 12(b)(6).

      The assault that prompted this suit occurred on the night of March 22, 2014. (FAC ¶ 13.) Around 10:15 p.m. that evening, four NYPD police officers responded to a call regarding an emotionally disturbed person ("EDP"): Officer Gomez, Officer Gomez's partner Officer Esteban

1

Abreu, Officer Jacy Reese, and Officer Reese's partner Officer Taiwo Adeleke. (*Id.* ¶ 14.) The four officers and the EDP scuffled, and during the altercation Gomez discharged his oleoresin capsicum spray ("OC Spray") in close proximity to the other three officers, causing them to receive some of the OC Spray's discharge. (*Id.* ¶¶ 15–17.) The officers eventually restrained the EDP using Reese's handcuffs, and Gomez and Abreu escorted the individual to the hospital. (*Id.* ¶¶ 18–20.) Gomez and Abreu recovered Reese's handcuffs at the hospital, and the four officers then arranged to meet so that Gomez and Abreu could return the handcuffs to Reese. (*Id.* ¶¶ 21–22.)

The four officers met again around 10:40 p.m. on Fifth Avenue between 135th and 136th Streets in Manhattan. (*Id.* ¶ 23.) Abreu pulled his police car next to Reese and Adeleke's and, at Reese's suggestion, parked in front of Reese and Adeleke's car. (*Id.* ¶¶ 25–26.) Reese indicated that Adeleke wanted to speak with Abreu, so Abreu exited his car and walked back toward Adeleke. (*Id.* ¶¶ 26–27.) At the same time, Reese exited his car and walked toward Gomez. (*Id.* ¶¶ 27, 30.)

But Adeleke's request to talk to Abreu was a ruse meant only to distract Abreu so that Reese could assault Gomez with his OC Spray. (*Id.* ¶¶ 24, 28.) Reese approached the passenger side door of Abreu's parked car, where Gomez was seated, and stated: "Listen, let me tell you something. Do you think it's funny to spray other officers?" (*Id.* ¶ 30.) With that, Reese took out his department-issued OC Spray and discharged it into Gomez's face and eyes, saying "Now you know how it feels." (*Id.* ¶ 32.) Reese pinned the door shut as Gomez struggled to exit the vehicle, causing Gomez to injure his knee. (*Id.* ¶¶ 35–36, 44.) Eventually, Abreu arrived at the vehicle, pushed Reese out of the way, and drove himself and Gomez away from the scene. (*Id.* ¶¶ 37–38.)

Now several blocks away, Gomez and Abreu notified Defendant Sergeant Robyn Kreppel, the Sergeant in charge of Patrol Operations that night, and Desk Sergeant Jose Carabello of the incident. (*Id.* ¶¶ 39–40.) Shortly thereafter, four NYPD officers—all defendants in this action—arrived at Gomez and Abreu's location: Kreppel; Sergeant Alfred Gallichio, a delegate of the Sergeants Benevolent Association; Officer Ulysses Dadacay, a delegate of the Patrolman's Benevolent Association ("PBA"); and Officer John Doe, also a PBA delegate. (*Id.* ¶ 41.) Kreppel contacted the Emergency Service Unit, and Gomez received medical treatment on the scene and later at Mount Sinai-St. Luke's Hospital. (*Id.* ¶¶ 42–44.) Kreppel, Gallichio, Dadacay, and Doe accompanied Gomez and Abreu to the hospital. (*Id.* ¶ 43.)

From this point forward, Kreppel, Gallichio, Dadacay, and Doe engaged in various attempts to cover up the assault. First was the discussion at the hospital. Dadacay and Doe spoke to Gomez in his hospital room, attempting to dissuade him from filing an internal report or bringing a criminal charge. (*Id.* ¶ 46–47.) Dadacay informed Gomez that if he filed a complaint, he would be transferred and likely placed on modified duty, Abreu's promotion would be jeopardized, and Gomez would be labeled a "rat." (*Id.* ¶ 48.) Before departing, Dadacay stated that he would delay notifying the Internal Affairs Bureau ("IAB") of the assault so that the incident could be kept "in-house." (*Id.* ¶ 51.)

Second was the discussion at the stationhouse. Upon their return to the 32nd precinct stationhouse, Gomez and Abreu were met by Dadacay. (*Id.* ¶ 53.) Dadacay told Gomez, Abreu, Reese, and Adeleke that they would each be interviewed by Captain Garcia, the Executive Officer of the 32nd precinct, and Dadacay instructed the four officers to tell Captain Garcia that Reese accidentally discharged his OC Spray while instructing Gomez on its use. (*Id.* ¶¶ 54–55.)

Captain Garcia interviewed each of the four officers individually, but Dadacay was present at each interview, in Gomez's words, "to ensure that [Gomez] told Captain Garcia the cover story." (*Id.* ¶¶ 56–57.)

Third was the paperwork. Following his interview with Captain Garcia, Gomez received "Line of Duty" paperwork, prepared by Gallichio and Kreppel, that omitted Gomez's eye injury and falsely attributed his knee injury to his earlier altercation with the EDP. (*Id.* ¶¶ 58–59.) Gomez signed the report. (*Id.* ¶ 60.) Kreppel also failed to file a "Pepper Spray Aided Report" and other documents that were necessary to protect Gomez's pension rights with respect to line-of-duty injuries. (*Id.* ¶¶ 63–64.)

Fourth was the IAB interview. Neither Gomez nor any of the individual defendants notified the IAB of the incident. (*Id.* ¶¶ 62, 68.) The IAB was notified, however, by both Carabello and Abreu (*id.* ¶¶ 66–67), and Gomez was ordered to attend an IAB interview scheduled for August 1, 2014 (*id.* ¶¶ 71, 74). Before Gomez's interview, Dadacay spoke with Gomez and reminded him to "stick to the story." (*Id.* ¶ 72.) But Gomez did not follow Dadacay's admonishment, and he told the IAB the truth. (*Id.* ¶¶ 73–75.) After he reported the assault, Gomez was subjected to a hostile work environment (*id.* ¶ 76), including verbal abuse from his fellow officers (*id.* ¶¶ 84–91) and an unsuccessful Civilian Complaint Review Board investigation prompted by Reese (*id.* ¶¶ 78–82). At his Commanding Officer's encouragement, Gomez requested and received a transfer to a different precinct in October 2014. (*Id.* ¶¶ 76–77.)

Gomez filed this action on September 23, 2015. (Dkt. No. 1.) In his Complaint, Gomez asserts three sets of claims: (1) violations of his Fourth and Fourteenth Amendment rights, arising out of Reese's alleged assault (*see* FAC ¶¶ 92–99 ("Count One"); *id.* ¶¶ 100–07 ("Count Two")); (2) violations of his First and Fourteenth Amendment rights, arising out of the alleged

cover-up (*see id.* ¶¶ 108–14 ("Count Three")); and (3) unlawful discrimination based on Gomez's perceived race or ethnicity, in violation of the NYCHRL (*see id.* ¶¶ 115–23 ("Count Four")). Arguing that Gomez has failed to state a claim upon which relief can be granted, Defendants Adeleke, Dadacay, Gallichio, and the City (collectively, "Movants") filed the instant motion to dismiss pursuant to Rule 12(b)(6). (Dkt. No. 78.)

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a motion to dismiss, courts "must accept as true all of the factual allegations contained in the complaint," *Twombly*, 550 U.S. at 572 (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n.1 (2002)), and must draw "all inferences in the light most favorable to the non-moving party[]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (Sotomayor, J.). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court may "look[] only to the complaint; documents that are attached as exhibits to, incorporated by reference, or integral to the complaint; and matters of which judicial notice may be taken." *Rhee-Karn v. Burnett*, No. 13 Civ. 6132, 2014 WL 4494126, at *3 (S.D.N.Y. Sept. 12, 2014) (citing *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993)).

**III. Discussion**

    **A.  Fourth and Fourteenth Amendment Claims Arising from the Assault**

Counts One and Two arise out of Reese's alleged assault on Gomez with his OC Spray. Gomez seeks relief pursuant to § 1983 for violations of his Fourth and Fourteenth Amendment "rights to be free from . . . unreasonable and unnecessary use of excessive force [and] unreasonable seizures, and to bodily integrity." (FAC ¶ 93.) Count One states a claim against Reese directly (*id.*), against Adeleke both for his participation in the assault and his failure to intervene to prevent it (*id.* ¶¶ 94–95), and against Kreppel, Gallichio, Dadacay, and Doe for "act[ing] maliciously and intentionally in failing to intercede to prevent the continuing deprivations of [Gomez's] rights" (*id.* ¶ 96). Count Two alleges that Kreppel and Gallichio are additionally liable as supervisors for "acquiesce[ing] in and condon[ing] the actions of Defendant Reese" and for "fail[ing] to supervise their subordinates." (*Id.* ¶¶ 105–06.)

Section 1983 imposes liability on individuals who act "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983; *see also West v. Atkins*, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff . . . must show that the alleged deprivation was committed by a person acting under color of state law."). Identifying the conduct covered by "under color of" requires courts to strike a delicate balance. On the one hand, the Supreme Court has made clear that acting *under color of* law is not synonymous with acting *in accordance with* state law. *See Monroe v. Pape*, 365 U.S. 167, 184 (1961) (noting that *United States v. Classic*, 313 U.S. 299 (1941), rejected the claim that "'under color of' state law include[s] only action taken by officials pursuant to state law" and applying the *Classic* rule to § 1983 cases), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978). An individual who is acting unlawfully still acts under color of law "when he abuses the position given to him by the State." *West*, 487 U.S. at 50. On the other hand, while "under

6

color of" is not so narrow as to cover only lawful conduct, the phrase is not so capacious as to include every action taken by a public employee in all facets of his life. "Thus acts of officers in the ambit of their personal pursuits are plainly" not covered by the under-color-of umbrella. *Screws v. United States*, 325 U.S. 91, 111 (1945). Taken together, "[t]he traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West*, 487 U.S. at 49 (quoting *Classic*, 313 U.S. at 326).

The task, then, is to determine where a police officer's official actions end and his personal conduct begins. A variety of factors influence this determination, including "the duty status of the officer, whether the officer identified himself as an officer, was in uniform, flashed a badge, used a department issued weapon, or issued any commands." *Isaacs v. City of New York*, 10 Civ. 4177, 2012 WL 314870, at *2 (E.D.N.Y. Feb. 1, 2012). But none of these factors is dispositive. *Id.* As the Second Circuit has observed, "[W]hile it is clear that 'personal pursuits' of police officers do not give rise to section 1983 liability, there is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law." *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994).

At the motion-to-dismiss stage, the question is whether Gomez has alleged facts that, if true, would establish that Reese was acting "under color of" law when he intentionally discharged his OC Spray at Gomez. To be sure, Gomez points to a number of factors that counsel in favor of concluding that Reese's action was taken "under color of" law; yet none of these factors is conclusive. (Dkt. No. 81 at 13–15.) First, Reese was on duty and in uniform at the time of the assault. However, "[m]ore is required [to assess whether action was under color of law] than a simple determination as to whether an officer was on or off duty when the

7

challenged incident occurred." *Pitchell*, 13 F.3d at 548); *see also Isaacs*, 2012 WL 314870, at *2 & n.2 (collecting cases). Second, Reese used his police radio and vehicle to arrange the meeting, and his department-issued OC Spray to conduct the attack. However, the use of government property does not automatically transform an act into conduct under color of law. *See, e.g.*, *Pitchell*, 13 F.3d at 546, 548 (holding that an officer did not act under color of law when he shot a houseguest with police department-issued bullets); *Molera v. City of Nogales*, 11 Civ. 97, 2013 WL 4804292, at *5 (D. Ariz. Sept. 9, 2013) (concluding that a police officer who assaulted a fellow officer with his department-issued Taser did not act under color of law). Finally, Reese relied on his status as a police officer, and his need to retrieve his department-issued handcuffs, as an excuse to gain access to Gomez. *But see Martinez v. Colon*, 54 F.3d 980, 982–83, 987–88 (1st Cir. 1995) (holding that a police officer who assaulted a fellow officer at the precinct station was not acting under color of law); *Morton v. City of Albany*, No. 08 Civ. 1304, 2009 WL 2568595, at *5–6 (N.D.N.Y. 2009) (concluding that a police officer did not act under color of law when he pointed his gun at his subordinate civilian employee).

In the typical case, these indicia of authority could certainly compel the conclusion that Reese was acting under color of state law. But this case differs in one crucial respect from the typical case: Unlike the usual plaintiff bringing a § 1983 action against a police officer, Gomez is a police officer himself. To act under color of law, a police officer must be asserting "actual or pretended authority." *Pitchell*, 13 F.3d at 549; *see also Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the *badge of their authority* to deprive individuals of their federally guaranteed rights . . . ." (emphasis added)). The traditional color-of-law factors, such as "whether defendants identified themselves as police officers," "if plaintiff was aware that the defendants were police officers," or "if defendants drew a firearm or

arrested the plaintiff,*" Wahhab v. City of New York*, 386 F. Supp. 2d 277, 288 (S.D.N.Y. 2005), serve as proxies to measure whether a defendant purported to exercise his authority over the plaintiff. But police officers exercise actual and apparent authority over civilians that they do not exercise over their co-workers, and an officer is less likely to act under "pretense of law," *Pitchell*, 13 F.3d at 548, vis-à-vis his fellow officers.

Several other courts have concluded that police officers do not exercise sufficient authority over each other for their conduct to constitute action under color of law. In *Martinez*, the First Circuit considered the case of a police officer who accidentally shot a fellow officer—at the police station, with his service weapon—after a series of escalating taunts and ongoing harassment. 54 F.3d at 987–88. The court explained:

> [T]hroughout the course of [the plaintiff's] ordeal [the defendant] did not exercise, or purport to exercise, any power (real or pretended) possessed by virtue of state law. To the contrary, [the defendant] was bent on a singularly personal frolic: tormenting an acquaintance. Though on duty and in uniform, [the defendant's] status as a police officer simply did not enter into his benighted harassment of his fellow officer. Hazing of this sort, though reprehensible, is not action under color or pretense of law.

*Id.* at 987 (footnote omitted).

Similarly, in *Washington-Pope v. City of Philadelphia*, Judge Pratter of the Eastern District of Pennsylvania concluded that an officer did not act under color of law when he pointed his service weapon at his partner's temple during an argument in their shared police vehicle. 979 F. Supp. 2d 544, 573 (E.D. Pa. 2013). The court explained that "because the victim is a fellow police officer, a number of indicia of state action lack their usual luminosity. . . . [B]ehavior by the victim that suggests she was not intimidated by the perpetrator's *official status*—as opposed to by his weapon—militates against finding that the perpetrator acted under color of law." *Id.* at 568 (citation omitted). As the court explained, "[I]t is an officer's purporting to exercise

9

authority . . . that brings his conduct under color of law, not the unfortunate coincidence of their co-employment." *Washington-Pope*, 979 F. Supp. 2d at 569; *see also Molera*, 2013 WL 4804292, at *4–5 (concluding that "horseplay" that resulted in one officer deploying his Taser against a fellow officer was not under color of law because "[n]o reasonable juror could infer that [the defendant] was pretending to act in his official capacity when he tased [the plaintiff]").

Indeed, in *Monsky v. Moraghan*, the Second Circuit distinguished cases such as *Martinez*—in which "state employees who harassed their fellow employees were held not to have acted under color of law"—by explaining that "since the plaintiff and the defendants were all relatively low-level . . . workers and none had authority over any other, the defendants had abused no 'authority' in harassing [the] plaintiff[s]." 127 F.3d 243, 246 (2d Cir. 1997).

In this case, the alleged facts lead this Court to conclude that Reese was not acting under color of law when he assaulted Gomez. Reese's alleged assault on Gomez was a highly "personal pursuit" based on Reese's desire to retaliate against Gomez for a perceived slight. *Pitchell*, 13 F.3d at 548 (quoting *Screws*, 325 U.S. at 111). The allegations do not show that Reese fundamentally invoked his power as an NYPD officer. As in *Martinez*, Reese did not "purport to exercise . . . any power (real or pretended) possessed by virtue of state law" but rather "was bent on a singularly personal frolic: tormenting [Gomez]." *Martinez*, 54 F.3d at 987. And as in *Washington-Pope*, Gomez gives no indication in the Complaint that he was "intimidated by [Reese's] *official status*—as opposed to by his weapon." *Washington-Pope*, 979 F. Supp. 2d at 568. With respect to a fellow police officer such as Gomez, Reese's assault was not accompanied by the "indicia of state action" necessary to establish conduct under color of law. *Id.* Thus, this Court echoes the *Martinez* Court in observing that "[h]azing of this sort, though reprehensible, is not action under color or pretense of law." *Martinez*, 54 F.3d at 987.

Movants face § 1983 liability for constitutional violations arising out of Reese's assault only if Reese himself is suable under the statute. *See Pitchell*, 13 F.3d at 549. Because Reese was not acting under color of law, none of the moving defendants may be held liable under § 1983.[1] Accordingly, Counts One and Two of the Complaint are dismissed with respect to Movants.

## B. First and Fourteenth Amendment Claims Arising from the Cover-up

Count Three alleges that Kreppel, Gallichio, Dadacay, and Doe violated Gomez's First Amendment right to petition the government for redress of grievances. (FAC ¶¶ 108–14.) The Complaint alleges that the defendants (1) threatened to take retaliatory employment action against Gomez if he reported the incident (FAC ¶ 48); (2) pressured Gomez to make false statements indicating the assault was an accident (*id.* ¶¶ 54–57, 72, 111); (3) prepared inaccurate Line of Duty paperwork for Gomez to sign (*id.* ¶¶ 58–59); and (4) retaliated against Gomez when he gave a truthful account of the incident to IAB investigators (*id.* ¶¶ 76, 84–91). Gomez alleges that as a result of these actions, he "was intimidated and did not report the incident to IAB" and "did not, initially, file criminal charges against Defendant Reese." (*Id.* ¶¶ 113–14.)

Construed in the light most favorable to Gomez, the Complaint plausibly alleges a violation of the First Amendment. The First Amendment guarantees individuals the right "to petition the Government for a redress of grievances." U.S. Const. amend. I. That right "extends to all departments of the Government." *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *see also Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) ("[T]he Petition Clause protects the right of individuals to appeal to courts *and other forums*

---

[1] Because the Court concludes that Reese did not act under color of law, it need not address Movants' other arguments in favor of granting the motion to dismiss with respect to Counts One and Two.

*established by the government for resolution of legal disputes.*" (emphasis added)). The right to petition includes both the right "to complain to public officials," *Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 692 (S.D.N.Y. 2004) (quoting *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994)) (internal quotation marks omitted), and the right to file criminal charges, *see Jackson v. New York*, 381 F. Supp. 2d 80, 89 (N.D.N.Y. 2005).

Movants accurately note that public employees' First Amendment rights are not absolute. It has long been established that "[w]hen a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern." *Borough of Duryea*, 564 U.S. at 386 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)). And in *Borough of Duryea*, the Supreme Court clarified that the "public concern test" also applies to Petition Clause cases. 564 U.S. at 389; *see also White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2d Cir. 1993).[2] The public-concern test is satisfied when an employee's speech can "can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Snyder v. Phelps*, 562 U.S. 443, 444 (2011) (quoting *Connick*, 461 U.S. at 146). "[A] topic is a matter of public concern for First Amendment purposes if it is 'of general interest,' or 'of legitimate news interest,' or 'of value and concern to the public at the time' of the speech." *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004)).

The Court cannot conclude at the motion-to-dismiss stage that Gomez's petitioning failed to address a matter of public concern. "Whether an employee's speech addresses a matter of

---

[2] Because Movants do not argue that Gomez's petition arose "pursuant to" his official duties, this Court does not need to address whether such a test applies in Petition Clause cases and, if so, whether Gomez's expression would pass the test. *See Looney v. Black*, 702 F.3d 701, 710 (2d Cir. 2012); *Ross v. New York City Dep't of Educ.*, 935 F. Supp. 2d 508, 526 (E.D.N.Y. 2013).

public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 143. Mindful that "[g]overnment offices could not function if every employment decision became a constitutional matter," *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006) (quoting *Connick*, 461 U.S. at 143) (internal quotation marks omitted), the Court nevertheless heeds the Second Circuit's observation that "[e]xposure of official misconduct, especially within the police department, is generally of great consequence to the public." *Jackler*, 658 F.3d at 236 (quoting *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001) (internal quotation marks omitted); *see also Griffin v. City of New York*, 880 F. Supp. 2d 384, 402 (E.D.N.Y. 2012) (concluding that reports to the IAB concerning "[a] police officer allegedly rallying his colleagues to lie in the course of an internal probe into a botched murder investigation and then threatening a fellow officer to accept fault for something he did not do" raised an issue "of paramount public concern").

Gomez's allegation that a police officer intentionally assaulted a fellow officer may very well raise an issue "of value and concern to the public." *Jackler*, 658 F.3d at 236 (quoting *City of San Diego*, 543 U.S. at 83–84 (2004)). Indeed, "police malfeasance consisting of the use of excessive force is plainly a matter of public concern." *Id.* at 237. That remains true when the alleged assault was conducted not under color of law but rather as a personal pursuit to carry out a violent and retributive vendetta.

Accordingly, Count Three survives the motion to dismiss.[3]

---

[3] Although Gomez names New York City as a defendant in this action, the Complaint does not allege any facts that would support imposing liability on the City for violating Gomez's federal rights. Gomez has not put forth any factual allegations that a custom or policy of the City caused violations of his constitutional rights, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and concedes that "Plaintiff's Amended Complaint does not assert a § 1983 municipal liability claim against [New York] City" (Dkt. No. 81 at 9). Accordingly, to

## C. State Law Claims Under the NYCHRL

Count Four alleges that the individual Defendants subjected Gomez to a hostile work environment in violation of the NYCHRL, New York City Administration Code § 8-107 *et seq*. (FAC ¶¶ 115–23.) The NYCRL makes it

> an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the actual or perceived . . . race, creed, color, national origin, . . . or alienage or citizenship status of any person . . . to discharge from employment such person; or . . . [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment.

New York City Administration Code § 8-107(1)(a). Count Four alleges that (1) "the actions of Defendants Reese and Adeleke were based, on whole or in part, on the perceived race or ethnicity of [Gomez]"; (2) "[t]he actions of Defendant Dadacay were motivated, in whole or in part, [by] the perceived race or ethnicity of Plaintiff"; and (3) "[t]he supervisory Defendants, despite their knowledge of the hostile work environment to which Plaintiff was subjected, failed to take any steps to prevent their subordinates from abusing Plaintiff." (FAC ¶¶ 88, 120–122.)

To establish a claim of race-based discrimination under the NYCHRL, a plaintiff must show by a preponderance of the evidence that he was treated "less well" on account of his race. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (quoting *Williams v. New York City Hous. Auth.*, N.Y.S.2d 27, 39 (1st Dep't 2009)). While courts "constru[e] the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible,'" *Mihalik*, 715 F.3d at 109 (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)), they also "must be mindful that the NYCHRL

---

the extent Count Three of the Complaint could be interpreted to assert a claim against New York City, the motion to dismiss with respect to the City is granted.

is not a 'general civility code,'" *id.* at 110 (quoting *Williams*, N.Y.S.2d at 40–41). "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." *Id.*

The Complaint fails to put forward "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Gomez alleges "on information and belief" that he was ill-treated by his coworkers and supervisors on account of his race. (FAC ¶¶ 88, 120–122). But to survive a motion to dismiss, a plaintiff must offer "more than labels and conclusions," *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678. The Complaint is devoid of facts that could "allow[] the court to draw the reasonable inference," *id.*, that Gomez's mistreatment occurred *because of* his race. *See Mihalik*, 715 F.3d at 110. Instead, the only reasonable inference supported by the Complaint is that the defendants subjected Gomez to a hostile work environment because he reported Reese's assault. Gomez alleges as much throughout the Complaint. (*See, e.g.*, FAC ¶ 84 ("[Plaintiff] has . . . been subjected to a hostile work environment as a result of telling the truth about the incident); *id* ¶ 86 ("Plaintiff has been subjected to verbal abuse by his fellow officers for reporting the OC Spray incident.").)

Accordingly, Count Four of the Complaint is dismissed with respect to Movants.

## IV. Conclusion

For the foregoing reasons, Movants' motion to dismiss the Complaint is GRANTED in part and DENIED in part. Movants shall file an answer to the surviving claims by September 15, 2017.

The Clerk of Court is directed to close the motion at Docket Number 78.

SO ORDERED.

Dated: August 29, 2017
       New York, New York

_____
J. PAUL OETKEN
United States District Judge